**In re Howard K. STERN, Relator.**

**No. 01–09–00438–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 25, 2010.

Bonnie Stern, Beverly Hills, CA, Charles L. Babcock, Nancy Hamilton, Jackson Walker L.L.P., Harry Paul Susman, Richard Wolf Hess, Susman Godfrey LLP, Michael Meyer, Neil C. McCabe, The O'Quinn Law Firm, Lyndal Harrington, Houston, TX, James M. McCown, Nesbitt, Vassar, McCown & Roden LLP, Dallas, TX, Teresa Stephens, North Richland Hills, TX, for Appellant.

L. Lin Wood, Luke A. Lantta, Bryan Cave, LLP, Atlanta, GA, Walter A. Herring, Bryan Cave, LLP, Dallas, TX, for Appellee.

Panel consists of Justices KEYES, ALCALA, and HANKS.

## OPINION ON REHEARING

EVELYN V. KEYES, Justice.

On July 12, 2010, a panel of this Court conditionally granted relator, Howard K. Stern's, petition for writ of mandamus. Real party in interest, Virgie Arthur, moved for rehearing on July 26, 2010. We deny Arthur's motion for rehearing, but we withdraw our July 12, 2010 opinion and issue this opinion in its place.

In this petition for writ of mandamus, relator, Howard K. Stern, requests that we direct the trial court to vacate its May 11, 2009 order requiring Stern to produce his computer hard drive to a special master for forensic examination.[1] In five issues, Stern contends that the trial court abused its discretion by (1) ordering Stern's surrender of his hard drive even though Stern is a non-resident defendant with a special appearance pending, (2) ordering the surrender of Stern's hard drive to a special master when there has been no showing that Stern was noncompliant with responding to discovery or responded in bad faith, (3) authorizing a forensic examiner to determine the relevancy of the documents on Stern's hard drive, (4) authorizing a forensic examiner for discovery requests that are overbroad and irrelevant to the issue of personal jurisdiction, and (5) ordering Stern to comply with an overbroad order for which there is no adequate remedy by appeal.

## Background

On April 28, 2008, Virgie Arthur filed the underlying proceeding against Howard K. Stern, Bonnie Stern, Lyndal Harrington, Art Harris, Nelda Turner, Teresa Stephens, Larry Birkhead, Harvey Levin, and TMZ Productions, Inc., alleging that certain syndicated television broadcasts and internet publications defamed her and harmed her efforts to seek custody and visitation of her granddaughter, who is the child of Vickie Lynn Marshall, also known as Anna Nicole Smith. Howard K. Stern is Marshall's former attorney and companion.

---

1. The underlying lawsuit is *Virgie Arthur v. Howard K. Stern, Bonnie Stern, Lyndal Harrington, Art Harris, Nelda Turner, Teresa Stephens, Larry Birkhead, Harvey Levin, and TMZ Productions, Inc.*, No. 2008–24181, filed April 28, 2008 in the 280th District Court of Harris County Texas, Hon. Tony Lindsay presiding. After this petition for writ of mandamus was filed, Arthur joined CBS as a defendant.

In her "Original Petition," Arthur alleged that Stern conspired with the other defendants, internet bloggers, and the celebrity and entertainment gossip website, TMZ, to defame her by providing Stern with a tape and transcript of an interview in which Marshall accused Arthur of being complicit in alleged abuse of her as a child, which he distributed to the news media, and by broadcasting the interview. Arthur further alleged that because she "opposed HOWARD STERN's false assertion that he was the biological father of [Marshall's infant daughter] and [was] entitled to custody of the infant girl," Stern "was infuriated over this and worked with the defendants and others to continue a plot and a conspiracy to destroy VIRGIE and anyone else he perceived was standing in his way of gaining custody of [the infant]."

Arthur alleged that defendant Harris republished the defamatory statements made by Marshall on his website and in an article. She contended that "Harris has claimed to be in direct contact with Defendant HOWARD STERN, who, HARRIS says, shares with HARRIS's secret thoughts [sic]." She further alleged that, in connection with the alleged conspiracy, "HARRIS has received from HOWARD STERN's representatives and has published certain documents that were under protective order in a related case"; that Harris has had a "conspiratorial relationship with [defendant Nelda (Rose)] TURNER"; and that that relationship and the expectation that he would leak documents are demonstrated by e-mails. Arthur alleged that "HARRIS was aware that TURNER and other co-conspirators live in Texas"; that he "directed his defamatory statements at Plaintiff's reputation, which is entered in Texas"; and that "HOWARD STERN communicated and led the conspiracy by using his sister, defendant BONNIE STERN ... to find what they considered 'VIRGIE ARTHUR dirt.'" The results of these searches were then published on a blog run by Turner, on Harris's website, or on a web log moderated by defendants Lyndal Harrington and Theresa Stephens.

In her "First Amended Original Petition" and "Second Amended Original Petition," Arthur alleged more specific jurisdictional facts. In her "Second Amended Original Petition," she alleged that Texas has specific personal jurisdiction over Stern because he used a Texas resident, Turner, as his agent to defame Arthur through his sister, Bonnie Stern, who sent emails to Turner in Texas allegedly informing Turner of Stern's "wishes and other work being done on this behalf by the CONSPIRATORS to defame VIRGIE ARTHUR and others."

On August 1, 2008, Arthur served Stern with requests for production. The requests for production instructed Stern to "[p]roduce documents and tangible things in the forms as they are kept in the ordinary course of business" and to "[p]roduce electronically stored information in native format." The instructions in the request for production further stated that, for any electronically stored information, Stern should:

> [P]roduce a discovery log that details the type of information, the source of information, the discovery request to which the information corresponds, and the information's electronic ID number.

> [W]rite all of the electronically stored information to reasonably usable storage media, such as CD, DVD, or flash drive.

> [I]dentify every source containing potentially responsive information that [Stern] is not searching for production .... [and,] [f]or any materials that [Stern] claim[s] no longer exist or cannot be located, provide all of the following:

> (1) A statement identifying the material.

(2) A statement of how and when the material passed out of existence or when it could no longer be located.

(3) The reasons for the material's nonexistence or loss.

(4) The identity, address, and job title of each person having knowledge about the nonexistence or loss of the material.

(5) The identity of any other materials evidencing the nonexistence or loss of the material or any facts about the nonexistence or loss.

Arthur's request for production number one requested that Stern "produce copies of all communications, including but not limited to email and other electronic communications, for the period September 2006 to present" between Stern and 39 listed email addresses. Some of the email addresses belonged to Stern's attorneys. Arthur's request for production number two requested that Stern "[p]roduce all documentation of the identity and/or contact information" for the 39 email addresses listed in request number one, including "website registration information, names, physical addresses, telephone numbers, email addresses, and IP addresses." Request for production number three requested that Stern "[p]roduce copies of all communications, including but not limited to email and other electronic communications, for the period September 2006 to the present, between you and the following or about the following." The request then listed 39 individuals or entities related to Arthur's claims against Stern and the other defendants in the case, including several parties' attorneys.

Stern filed a special appearance on August 4, 2008. In that special appearance he denied all bases for personal jurisdiction in Texas and attached an affidavit supporting his claims.

On September 3, 2008, Stern served Arthur with his objections and responses to Arthur's request for production. Specifically, Stern stated that the requests exceeded the scope of jurisdictional discovery, violated attorney-client and work product privileges, were overbroad, and were irrelevant.

On November 19, 2008, Stern filed a trial brief in support of his special appearance. In that brief, Stern argued that his special appearance should be sustained because Arthur had failed to plead allegations that would satisfy Texas's long-arm statute. He pointed out that the allegedly defamatory statements included "no statements made by Stern himself" and that Arthur had connected him to the statements of others only "by vaguely claiming he 'led the conspiracy.'" He argued, "Since Arthur has failed to point to a single activity committed by Defendant Stern that is in any way connected to Texas, specific jurisdiction is lacking as a matter of law."

Arthur objected to the trial court's deciding the special appearance without further discovery. In her response to Stern's special appearance, she referenced emails from Bonnie Stern to Turner conveying Stern's requests for transcripts of television broadcasts and his appreciation of summaries of videos that Turner had watched; one email exchange between Turner and Stern in which Turner asked Stern if he had downloaded videos she had posted the day before; and Stern's reply and question to Turner whether she could post other videos so that they would automatically go to the download screen. Arthur alleged, "The foregoing email exchanges show that, over a considerable period of time, Nelda Turner, in Texas, was working for Howard K. Stern and that he was in a position to direct her as to the manner and details of the work she was doing for him." She alleged that these contacts showed that "Stern was using

Turner as his agent in Texas to gather information that he could use to damage Virgie Arthur's reputation."

On November 19, 2008, Stern's counsel agreed in a rule 11 agreement to postpone the hearing on Stern's special appearance set for November 21 and "not to urge that issue until after Mr. Stern's deposition has been taken."

On December 3, 2008, Arthur moved to compel production from Stern, asserting that Stern had failed to produce relevant documents. Thereafter, Stern produced responsive documents within parameters narrower than those constructed by Arthur. Specifically, Stern produced non-privileged communications between himself and his co-defendants concerning Arthur from October 12, 2006 through March 14, 2008 that he considered relevant to the jurisdictional issues. Stern also produced an affidavit in which he stated that (1) he had made a diligent search of his emails for communications between himself and his co-defendants concerning Arthur from October 12, 2006 through March 14, 2008 and had produced all non-protected, responsive documents and (2) his computer hard drive does not contain emails because he uses a web-based email system.

On December 11, 2008, at a hearing on her motion to compel discovery from Stern and other defendants, Arthur contended that the evidence sought from Stern in her requests for production was needed to establish the Texas courts' jurisdiction over Stern. She reasserted the claims in her original petition that Turner, a Texas resident, was Stern's agent, with whom he conspired to defame Arthur through his sister, Bonnie Stern; that evidence of email communications of the alleged conspirators with Turner in Texas was necessary to establish the court's personal jurisdiction over Stern; and that communications received from Turner in discovery indicated the existence of corre-

sponding emails from Stern that had not been produced. Arthur alleged that "the theory of our case is that Howard K. Stern was working through Bonnie Stern and an agent in Texas, Rose Turner, to get this defamation going and we can see e-mails from Rose in other filings where she is trying to get the . . . story developed." Arthur's counsel stated:

What we've gotten so far in this case, Your Honor, is numerous emails from Howard K. Stern to Nelda Turner through his sister Bonnie Stern. The way we've been able to figure out the conspiracy, Howard K. Stern was running it but being a lawyer and being smart, he was not wanting to directly contact Nelda Turner.

Now, we—we have lots of emails from Howard K. Stern's lawyers to Nelda Turner. . . . They were asking for all kinds of information from her. . . .

So we have emails that Howard K. Stern sent to his sister Bonnie asking Bonnie to get stuff from Nelda Turner in Texas. Sometimes he'll mention Nelda or Rose. See if Rose can get me this. Sometimes not. And Bonnie carelessly would sometimes just forward Howard K. Stern's emails to Nelda Turner.

. . . .

So we've got emails showing this connection to Howard, to Bonnie, to Nelda and back again. What we don't have is Howard's emails to Bonnie, Howard's emails to Birkhead, Howard's emails to Art Harris, the other member of the conspiracy. Those are crucial because it's clear from what I do have from Nelda Turner and from other members of the conspiracy who have cooperated with us that there were—they were all working together as a team.

Stern re-alleged his objections to discovery beyond communications relevant to the establishment of personal jurisdiction over

him. Also, in the course of the hearing, Stern's counsel reiterated Stern's agreement "for jurisdictional purposes" to "give [Arthur] e-mails from October the 12th, 2006 to March the 14th, 2008 which was the date they amended their complaint in federal court to bring in this particular cause of action." Stern's counsel then stated,

> So if that's acceptable, then our dispute is essentially resolved. I haven't heard anyone ask about Mr. Stern's hard drive and I'd be glad to speak to that if there's going to be some request for it down the road. I can represent to the Court that Mr. Stern uses Yahoo business, which is an Internet based e-mail system. So that if he deletes e-mails from his computer and doesn't print them out, they're not on his computer. So there's no need to search his computer.
>
> What would need to be done would be to simply file a subpoena with Yahoo and ask for the relevant documents from Yahoo and they would maintain those on their server. But that's what we're willing to do. I think that's certainly more than probably is necessary for jurisdictional purposes but hopefully that will resolve my problem with [Arthur's counsel] and we can get those documents to him. To the extent we need to supplement, we won't have a dispute to take up with Your Honor.

On January 23, 2009, Arthur supplemented her motion to compel by requesting that the trial court order Stern to submit his "computers, external hard drives, jump drives, and other such electronic media" to a forensic examiner appointed by the trial court.

On March 20, 2009, at a hearing scheduled on Stern's special appearance, the trial court, instead, heard Arthur's motion for a continuance. Arthur's counsel contended that the continuance was needed because the three defendants ordered to turn over their computers had not done so. Therefore, he asserted, he had not been able to take their depositions. He informed the court that Turner had turned over her computer with an estimated 13 gigabytes of electronic communications on four DVDs, and that "we've gone through much of that and that's been somewhat helpful, but," he contended, "without the production from those other defendants, including Mr. Stern who has not turned over his computer either but has not yet been ordered to do so, without those communications, we're hampered."

Arthur's counsel argued that, in a case alleging conspiracy, jurisdiction is established by showing "that the nonresident acted conspiratorially through a resident who was an agent of the nonresident, and the theory of our case to some extent is that Howard K. Stern acted conspiratorially with a Texas resident through his sister as an intermediary. Very rarely were there direct communications between the Texas resident, that being defendant Nelda Turner, and Howard K. Stern." He asked the trial court not to decide the special appearance "until we're able to obtain the discovery we believe we're entitled to under Rule 120a on the jurisdictional issue which our position is does relate to conspiracy and not just to defamation."

On May 8, 2009, the trial court heard Arthur's motion to compel discovery from Stern, which consisted of many of the same arguments presented at the December 11, 2008 hearing. The trial court signed an order granting Arthur's motion to compel on May 11, 2009.

The trial court's May 11, 2009 order required Stern to respond to requests for production numbers one and three, but not two; excluded communications between Stern and his attorneys and emails with family members "of a purely personal na-

ture"; and limited the scope of production to September 20, 2006 through March 14, 2008. Importantly, the May 11, 2009 order also appointed Craig Ball as master and forensic expert, providing in part:

(3) To facilitate production of such documents . . . the Court previously appointed Craig Ball, of Austin, Texas, as a Special Master . . . to conduct an independent forensic examination of relevant computer hard drives, external hard drives, jump drives, and other such repositories of electronic communications. . . . That appointment now is extended to include examination of Howard K. Stern's electronic media.

(4) To facilitate the work of the Special Master, this Court ORDERS Defendant Howard K. Stern to contact the Special Master Ball within 10 days of the signing of this order to make arrangements for capture and examination of Howard K. Stern's electronic media.

(5) At the option and expense of Defendant Howard K. Stern, Special Master Ball may travel to California, where the electronic media is currently located, to examine and copy the electronic media. If Stern chooses this option, he will pay in advance for Ball's time, portal-to-portal, 24–hours per day, at the rate of $250 per hour. Defendant Howard K. Stern will also pay for First Class or Business Class airfare and a good hotel. . . .

(6) Also at the option and expense of Defendant Howard K. Stern, Special Master Ball shall produce a copy of Defendant Howard K. Stern's electronic media and present that copy to the computer forensic expert of Defendant Howard K. Stern's choosing. If Defendant Howard K. Stern chooses this option, Ball will hold the original of Defendant Howard K. Stern's electronic media without viewing its contents for a period of 10 days after delivery of the copy to Defendant Stern's expert to allow that

expert an opportunity to view the contents first. At the expiration of that 10–day period, Special Master Ball will begin forensic examination of the electronic media and shall:

a. have discretion to employ or to modify search terms;

b. capture all remaining electronic communications, including but not limited to emails to or from the persons, entities and email addresses listed in parts 1 and 3 of Plaintiff's Requests for Production, and submit them to Defendant Howard K. Stern for privilege review prior to production.

(7) Within 14 days after receipt of the captured documents from the Special Master . . . Defendant Howard K. Stern shall produce a privilege log to Special Master Ball and to [Arthur] listing all documents submitted by Special Master Ball to Defendant Howard K. Stern, which Defendant Howard K. Stern has not produced to [Arthur] and the reasons for withholding the documents from production. Special Master Ball shall then produce all documents within the scope of paragraph one above that are not listed on the privilege log to [Arthur]. . . .

(8) [Arthur] shall have an opportunity to challenge any designation listed on the log and, in the event that a designation is challenged, Special Master Ball shall submit the log, along with the disputed document(s), to the Court for in camera inspection.

. . . .

(10) No waiver of privilege or confidentiality occurs if any otherwise privileged or confidential information is observed by Special Master Ball during the imaging and review process.

(11) Special Master Ball is expressly prohibited from using or disclosing any

information obtained through the imaging and examination of Defendant Howard K. Stern's electronic media other than providing to Defendant Howard K. Stern documents captured during his examination, except as specified in this order.

That order forms the basis of Stern's mandamus challenging the scope of the discovery ordered in general and the scope of discovery ordered prior to the hearing on his special appearance in particular.

### Standard of Review

■ Mandamus relief is appropriate only if a trial court abuses its discretion and no adequate appellate remedy exists. *In re CSX Corp.*, 124 S.W.3d 149, 151 (Tex.2003). The heavy burden of establishing an abuse of discretion and an inadequate appellate remedy is on the party resisting discovery. *Id.* A trial court commits a clear abuse of discretion when its action is "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Id.*(quoting *CSR Ltd. v. Link*, 925 S.W.2d 591, 596 (Tex.1996)).

■ Situations for which an appeal is inadequate include: when the order complained of requires disclosure of privileged information or trade secrets that materially affect the rights of the relator; when discovery imposes a burden that is disproportionate to any benefit received by the requesting party; and when the trial court's discovery order compromises the relator's ability to present a viable claim or defense. *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 468 (Tex.2008). Accordingly, mandamus relief is proper when a trial court signs an order compelling discovery that is outside the proper bounds of discovery. *In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex.1998) ("An order compelling discovery that is well outside the proper bounds is reviewable by mandamus."); *see In re Kuntz*, 124 S.W.3d 179, 184 (Tex.2003) (mandamus appropriate to correct trial court order compelling person to produce documents not in his "possession, custody, or control"); *Coates v. Whittington*, 758 S.W.2d 749, 750 (Tex.1988) (mandamus relief appropriate to set aside order for psychological examination). Mandamus relief also is appropriate when a trial court orders discovery procedures unrecognized within Texas. *See In re Does 1–10*, 242 S.W.3d 805, 819 (Tex.App.-Texarkana 2007, orig. proceeding) (mandamus appropriate when trial court disregarded Texas procedure for discovery and employed irrelevant federal statute).

### Order Compelling Discovery

In his first issue, Stern contends that the trial court abused its discretion by ordering him to deliver his computer hard drive, located outside the state of Texas, to a forensic examiner located in the forum state while his special appearance was pending. He argues that the discovery ordered exceeds the scope of discovery relevant to establish the trial court's personal jurisdiction over him. In his second issue, Stern contends that the trial court abused its discretion by ordering production of his hard drive when there was no predicate showing that he had defaulted in his obligation to respond to discovery or had responded in bad faith. We consider these issues together.

### A. Jurisdictional Discovery Pending Ruling on Special Appearance

Texas Rule of Civil Procedure 120a governs special appearances. Subsection (1) of the rule provides that a special appearance may be made "for the purpose of objecting to the jurisdiction of the court over the person or property of the defendant on the ground that such person or property is not amenable to process issued by the courts of this State." Tex.R. Civ. P. 120a(1). The Rule also states in subsection (1) that "[t]he issuance of process for

witnesses, the taking of depositions, the serving of requests for admissions, and the use of discovery processes, shall not constitute a waiver of [a] special appearance." *Id.; see also Exito Elecs. Co. v. Trejo*, 142 S.W.3d 302, 307 (Tex.2004) (stating, "[A] trial court's resolution of discovery matters related to the special appearance does not amount to a general appearance by the party contesting personal jurisdiction."). Subsection (2) of Rule 120a requires that "[a]ny motion to challenge the jurisdiction provided for herein shall be heard and determined before a motion to transfer venue or any other plea or pleading may be heard" and that "[n]o determination of any issue of fact in connection with the objection to jurisdiction is a determination of the merits of the case or any aspect thereof." TEX.R. CIV. P. 120a(2).

■ Rule 120a(3) governs jurisdictional discovery. The rule provides, "The court shall determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." TEX.R. CIV. P. 120a(3). It further provides that if it appears from the affidavits of a party opposing the special appearance "that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." *Id.* The grant or denial of a continuance of a special appearance hearing to obtain discovery authorized by Rule 120a will not be disturbed absent a showing of a clear abuse of discretion. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex.2002); *Barron v. Vanier*, 190 S.W.3d 841, 847 (Tex.App.-Fort Worth 2006, no pet.).

In *Dawson–Austin v. Austin*, the Texas Supreme Court indicated, without deciding, that discovery sought during the pendency of a special appearance but not directed to the discovery of jurisdictional facts may not be properly had before the special appearance is decided. *See Dawson–Austin v. Austin*, 968 S.W.2d 319, 321, 323 (Tex.1998) (stating that party who had filed *pro se* instrument including special appearance, motion to quash service of citation, plea to jurisdiction of court, plea in abatement, and, subject to these, original answer, and who sought continuance to take necessary discovery on special appearance and on motion to quash was "entitled to seek a postponement of the special appearance hearing until she could complete discovery, as expressly permitted by Rule 120a, and she was entitled to ask for more time for discovery on her motion to quash, *provided she did not attempt to take that discovery before the special appearance was decided.*") (emphasis added).

However, prior to *Dawson–Austin*, a number of Texas appellate courts had held that "nothing in Rule 120a specifically limits discovery to matters relating to the special appearance," and a number of courts, including this Court, continued to so hold. *Silbaugh v. Ramirez*, 126 S.W.3d 88, 93 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (refusing to follow dicta in *Dawson–Austin*, 968 S.W.2d at 321, 323, interpreting Rule 120a as limiting discovery to facts relevant to special appearance); *Case v. Grammar*, 31 S.W.3d 304, 311 (Tex. App.-San Antonio 2000), *abrogated by BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789 (Tex.2002); *Minucci v. Sogevalor, S.A.*, 14 S.W.3d 790, 801 (Tex. App.-Houston [1st Dist.] 2000, no pet.). These cases, however, dealt with *waiver* of the special appearance by the taking of discovery pertaining to the merits of the case. *See Silbaugh*, 126 S.W.3d at 93;

*Case,* 31 S.W.3d at 311; *Minucci,* 14 S.W.3d at 801.

In 2004, the Texas Supreme Court held that a trial court's resolution of discovery matters related to a special appearance does not amount to a general appearance that waives the special appearance by a party contesting personal jurisdiction and that a non-resident defendant's participation in the trial court's resolution of such discovery matters does not amount to a recognition that the action is properly pending or to a request for affirmative relief inconsistent with the jurisdictional challenge. *Trejo,* 142 S.W.3d at 307. But it also noted that the discovery in that case had concerned only the non-resident defendant's special appearance, and it pointedly expressed "no opinion on the effect of parties' participation in discovery that is unrelated to the special appearance before its resolution." *Id.* at 306 n. 24.

Subsequently, in a case in which a California corporation challenged personal jurisdiction, the Eastland Court of Appeals held that the trial court had abused its discretion by failing to hold a hearing on the corporation's special appearance before granting the plaintiff's motion to compel a deposition that was not limited to jurisdictional discovery and then sanctioning the corporation for failing to appear at the deposition when the plaintiff had not filed an affidavit stating she needed to depose the corporation's representative regarding jurisdiction to present facts essential to justify her opposition to the corporation's special appearance. *IRN Realty Corp. v. Hernandez,* 300 S.W.3d 900, 902–03 (Tex. App.-Eastland 2009, no pet.). The court pointed out that Rule 120a "specifically provides for the means to obtain a continuance of the special appearance so that a deposition may be conducted: affidavits of the party opposing the special appearance." *Id.* at 903. In *IRN Realty,* no affidavit had been filed stating that the

plaintiff could not present facts essential to justify her opposition to the special appearance or that she needed to depose the defendant's corporate representative regarding jurisdiction. *Id.* Because the plaintiff did not comply with the provisions of Rule 120a, the court of appeals held that the trial court abused its discretion in abating the hearing on the special appearance, as well as in granting a motion to compel that was not limited to jurisdictional discovery and awarding sanctions against the non-resident defendant. *Id.*

In the opposite situation, in which jurisdictional discovery was denied, this Court held that the trial court clearly abused its discretion by denying jurisdictional discovery that was sought three times by the plaintiffs by motions supported by affidavits in accordance with the procedure set out in Rule 120a(3). *Lamar v. Poncon,* 305 S.W.3d 130, 139–40 (Tex.App.-Houston [1st Dist.] 2009, pet. denied); *see also Said v. Maria Investments, Inc.,* No. 01–08–00962–CV, 2010 WL 457463, at *3 (Tex. App.-Houston [1st Dist.] Feb. 11 2010, no pet.) (mem. op.) (observing that "Rule 120a(3) gives the trial court the discretion to continue a special appearance hearing and thereby extend the time in which evidence may be served, but this power applies only to a party opposing the special appearance who avers that he cannot adequately prepare for the special appearance hearing.").

 We conclude that Rule 120a(3) by its plain language authorizes discovery by a party prior to a ruling on a special appearance only with respect to facts "essential to justify his opposition" to the special appearance. The trial court may permit a continuance so that the opposing party may obtain the necessary jurisdictional discovery. *See* TEX.R. CIV. P. 120a(3); *Lamar,* 305 S.W.3d at 139–40; *IRN Realty,* 300 S.W.3d at 903. However,

Rule 120a(3) does not authorize postponement of a special appearance hearing to allow a party to obtain discovery prior to the court's ruling on the special appearance that is unnecessary or irrelevant to the establishment of jurisdictional facts.

We further conclude that those cases holding that "nothing in Rule 120a specifically limits discovery to matters relating to the special appearance" are limited to those situations in which the issue is whether a defendant waives a special appearance by participating in discovery and that they do not apply when the issue is, as here, whether a trial court abuses its discretion by ordering or failing to order discovery at the request of a party opposing a special appearance. Those cases are controlled by the plain language of Rule 120a(3) and by *Dawson–Austin v. Austin* and its progeny.

■ Here, over Stern's objections to the breadth of discovery sought, and despite Stern's agreement to limited discovery, Arthur filed a motion to compel discovery that far exceeded discovery of jurisdictional facts, including all emails on Stern's computer hard drive to or from 39 email addresses. Although she appeared through her counsel at the December 11, 2008 hearing and argued that she needed the discovery sought in order to establish jurisdiction over Stern, Arthur provided no arguments or authorities that would support the contention that the discovery she sought was jurisdictional on any theory other than a broad-based conspiracy theory.

At the December 11, 2008 hearing, Arthur's counsel admitted that he had "lots of emails" showing Stern's indirect participation in the alleged conspiracy. He gave no cause to believe that "lots of emails" between Stern and Turner existed, nor did he base his pleading of jurisdictional facts on their existence. Stern's counsel stated on the record at the December 11 hearing that Stern had searched his computer and had turned over everything he had found related to the allegations pled; he offered to turn over to Arthur all email communications between Stern and all alleged participants in the conspiracy within the relevant time period up to the date on which this cause of action was filed; and he indicated that Yahoo! Business's records of emails within the agreed scope of discovery that were retained on its server could be obtained by subpoena.

There is no indication in the record that Arthur accepted Stern's representations or offer of cooperation at the December 2008 hearing or that any specific relevant and non-privileged jurisdictional discovery was withheld. All indications are that Arthur continued to assert that nothing less than the production of Stern's hard drive would satisfy her discovery demands. Indeed, at the hearing on March 20 at which Stern's special appearance was scheduled to be heard, Arthur, through her counsel, reiterated her opposition to the trial court's hearing the special appearance until she could obtain all of the discovery she had previously sought, as well as Stern's hard drive. Her counsel expressly reiterated Arthur's theory of jurisdiction, stated also at the December 11, 2008 hearing, as being "that Howard K. Stern acted conspiratorially with a Texas resident through his sister as an intermediary." Arthur's counsel admitted that Turner had produced her hard drive and that Arthur had explored it and obtained its contents, but he claimed that all of the additional discovery was necessary to establish jurisdiction over Stern on Arthur's conspiracy theory.

At the May 8, 2009 hearing on Arthur's motion to compel discovery from Stern, the same arguments were reiterated. The trial court granted the motion and entered the order that is the subject of this mandamus on May 11, 2009.

As Arthur's counsel stated in the opposition brief to Stern's special appearance and in open court during the hearings on Arthur's motion for continuance of Stern's special appearance and on her motion to compel, Arthur seeks to base the Texas courts' personal jurisdiction over Stern on his participation in a conspiracy to defame her, which Arthur alleges Stern conducted, in part, through indirect communications with Rose Turner in Texas made through his sister, Bonnie Stern. There is no indication in the mandamus record that Arthur has cause to believe that any significant number of emails from Stern to Turner in Texas existed or were necessary to establish jurisdiction.

■■■■■■ Texas law holds, with respect to a conspiracy theory of personal jurisdiction, that the inquiry is restricted to whether the defendant *"itself* purposefully established minimum contacts such as would satisfy due process." *See Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 773 (Tex.1995); *see also Carone v. Retamco Operating, Inc.,* 138 S.W.3d 1, 10 (Tex.App.-San Antonio, 2004, pet. denied). Thus, Stern's emails to co-defendants Bonnie Stern, Larry Birkhead, or Art Harris—none of them Texas residents—are not relevant to the establishment of the Texas courts' jurisdiction over Stern and cannot be essential to justify Arthur's opposition to Stern's special appearance. *See Gibson,* 897 S.W.2d at 773 (emphasis added).

We conclude, on the basis of the plain language of Rule 120a, the mandamus record, and the foregoing authorities, that the trial court clearly abused its discretion by ordering the discovery from Stern sought by Arthur's motion to compel and supplemental motion without a showing that the discovery ordered was relevant to the jurisdictional facts pled and essential to justify Arthur's opposition to the special appearance. *See* Tex.R. Civ. P. 120a.

We sustain Stern's first and second issues.

## B. Overbreadth and Appointment of Special Master and Forensic Examiner

In his third issue, Stern asserts that the trial court abused its discretion by authorizing a forensic examiner to determine the relevancy of the documents on Stern's hard drive. In his fourth issue, he asserts that the trial court abused its discretion by authorizing a forensic examiner to apply overbroad and irrelevant discovery requests to the determination of personal jurisdiction. In his fifth issue, Stern contends that there is no adequate remedy on appeal for the trial court's abuse of its discretion. Arthur responds that Stern defaulted in his obligation to respond to discovery and that Ball is not empowered to determine the relevancy of the documents on Stern's hard drive. We recast Stern's objections as (1) objections under the discovery rules to the scope of the discovery ordered to be made and (2) objections to the appointment of a special master and forensic examiner and to the trial court's order that Stern turn over his computer hard drive to the special master for inspection for discovery.

### 1. Scope of Discovery Under the Texas Discovery Rules

Discovery in this case is governed by Texas Rules of Civil Procedure 192.3, 192.4, 193, and 196.4. Rule 192.3 allows a party to "obtain discovery regarding any matter that is not privileged and is relevant to the subject matter of the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party." Tex.R. Civ. P. 192.3(a). The comments to Rule 192 state, "While the scope of discovery is quite broad, it is nevertheless confined by the subject matter of the case and reasonable expectations of obtaining infor-

mation that will aid resolution of the dispute." TEX.R. CIV. P. 192 cmt. 1; *see also CSX,* 124 S.W.3d at 152 ("Although the scope of discovery is broad, requests must show a reasonable expectation of obtaining information that will aid the dispute's resolution.").

Rule 192.4 imposes limitations on the scope of discovery. TEX.R. CIV. P. 192.4. It states:

The discovery methods permitted by these rules should be limited by the court if it determines, on motion or on its own initiative and on reasonable notice, that:

(a) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; or

(b) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

*Id.* Determinations regarding the scope of discovery are largely within the trial court's discretion. *In re Colonial Pipeline Co.,* 968 S.W.2d 938, 941 (Tex.1998) (citing *Dillard Dept. Stores, Inc. v. Hall,* 909 S.W.2d 491, 492 (Tex.1995)).

Rule 193 "imposes a duty upon parties to make a complete response to written discovery based upon all information reasonably available, subject to objections and privileges." TEX.R. CIV. P. 193 cmt. 1. It permits a party to object to discovery as overbroad and to refuse to comply with it entirely. *Id.* cmt. 2 (citing *Loftin v. Martin,* 776 S.W.2d 145 (Tex. 1989)). "A central consideration in determining overbreadth is whether the request could have been more narrowly tailored to avoid including tenuous information and

still obtain the necessary, pertinent information." *CSX,* 124 S.W.3d at 152. "[D]iscovery may not be used as a fishing expedition or to impose unreasonable discovery expenses on the opposing party." *In re Alford Chevrolet-Geo,* 997 S.W.2d 173, 181 (Tex.1999) (holding that not only must discovery requests be reasonably tailored to include only matters relevant to case, but discovery requests may not be used as fishing expedition or to impose unreasonable discovery expenses on opposing party) (citing *K Mart Corp. v. Sanderson,* 937 S.W.2d 429, 431 (Tex.1996)); *see also In re Am. Optical Corp.,* 988 S.W.2d at 713.

The discovery rules "explicitly encourage trial courts to limit discovery when 'the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.'" *In re Alford Chevrolet-Geo,* 997 S.W.2d at 181 (quoting TEX.R. CIV. P. 192.4(b)). "[A] discovery order that compels overly broad discovery 'well outside the bounds of proper discovery' is an abuse of discretion for which mandamus is the proper remedy." *Hall,* 909 S.W.2d at 492 (quoting *Texaco, Inc. v. Sanderson,* 898 S.W.2d 813, 815 (Tex.1995)).

Here, Arthur asserts that the requests for production are necessary for the determination of the trial court's personal jurisdiction over Stern because they may reveal his contacts with Turner, whose Texas residency is undisputed. Regardless of whether Stern's relationship with Turner could be determinative in assessing the question of personal jurisdiction, the trial court's May 11, 2009 order specifically requires Stern to produce all communications between himself and nearly forty individuals, only restricting the time period

for these communications from September 20, 2006, to March 14, 2008, excluding only communications between Stern and his attorneys and communications "between Stern family members that are of a purely personal nature."

We conclude that requests for production one and three are not narrowly tailored to avoid inclusion of tenuous information irrelevant to the establishment of jurisdiction, and they are thus overbroad. *See CSX,* 124 S.W.3d at 152. Indeed, many of the documents Stern must produce will certainly be irrelevant to the determination of the trial court's jurisdiction over him. *See Trejo,* 142 S.W.3d at 307. Because of their overbreadth and likelihood of encompassing irrelevant communications, the trial court's order requiring essentially unrestricted production from Stern's hard drive in response to Arthur's requests one and three authorizes an impermissible "fishing expedition." *See K Mart Corp.,* 937 S.W.2d at 431; *Hall,* 909 S.W.2d at 492; *Texaco, Inc.,* 898 S.W.2d at 815. Accordingly, we hold that the trial court abused its discretion in ordering overly broad discovery in response to Arthur's requests for production one and three. *See K Mart Corp.,* 937 S.W.2d at 431; *Hall,* 909 S.W.2d at 492; *Texaco, Inc.,* 898 S.W.2d at 815.

## 2. Appointment of Special Master for Forensic Examination

█ Finally, the trial court's May 11, 2009 discovery order required Stern to turn over his computer, located in California, and any other "repositories of electronic communications" for forensic examination ·by a special master, Craig Ball, appointed by the trial court. Stern was ordered either to contact the special master within 10 days "to make arrangements for capture and examination of [his] electronic media" in Texas or to "pay for First Class or Business Class airfare and a good hotel ... for Ball's travel to California"

and to "pay in advance for Ball's time, portal-to-portal, 24–hours per day, at the rate of $250 per hour." The order permitted Stern to obtain a copy of his "electronic media" from Ball to present to his own forensic expert so that expert could view the contents first. After that, Ball was given "discretion to employ or to modify search terms" and to "capture all remaining electronic communications, including but not limited to emails to or from the persons, entities and email addresses listed in parts 1 and 3 of [Arthur's] Requests for Production." After Ball had retrieved all that information, Stern was permitted to produce a privilege log to Ball and Arthur "listing all documents submitted by Ball to Stern, which Stern has not produced to [Arthur] and the reasons for withholding the documents from production." Any claim of privilege would then be subject to challenge by Arthur.

Rule of Civil Procedure 196.4 governs requests for production of "data or information that exists in electronic or magnetic form." TEX.R. CIV. P. 196.4. It provides:

> To obtain discovery of data or information that exists in electronic or magnetic form, the requesting party must specifically request production of electronic or magnetic data and specify the form in which the requesting party wants it produced. The responding party must produce the electronic or magnetic data that is responsive to the request and is reasonably available to the responding party in its ordinary course of business. If the responding party cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested, the responding party must state an objection complying with these rules. If the court orders the responding party to comply with the request, the court must also order that the requesting party pay the reasonable

expenses of any extraordinary steps required to retrieve and produce the information.

TEX.R. CIV. P. 196.4.

In *In re Weekley Homes*, the Texas Supreme Court held that Rule 196.4 requires a specific request "to ensure that requests for electronic information are clearly understood and disputes avoided." 295 S.W.3d 309, 314 (Tex.2009). It set out the appropriate procedure for requesting electronic information under the rules:

> When a specific request for electronic information has been lodged, Rule 196.4 requires the responding party to either produce responsive electronic information that is "reasonably available to the responding party in its ordinary course of business," or object on grounds that the information cannot through reasonable efforts be retrieved or produced in the form requested. Once the responding party raises a Rule 196.4 objection, either party may request a hearing at which the responding party must present evidence to support the objection. TEX.R. CIV. P. 193.4(a). To determine whether requested information is reasonably available in the ordinary course of business, the trial court may order discovery, such as requiring the responding party to sample or inspect the sources potentially containing information identified as not reasonably available.

*Id.* at 315. If the responding party fails to meet its burden of production, the trial court may order production subject to the discovery limitations imposed by Texas Rule of Civil Procedure 192.4. *Id.*

The supreme court recognized that "[p]roviding access to information by ordering examination of a party's electronic storage device is particularly intrusive and should be generally discouraged, just as permitting open access to a party's file cabinets for general perusal would be." *Id.* at 317. It stated:

> As a threshold matter, the requesting party must show that the responding party has somehow defaulted in its obligation to search its records and produce the requested data. The requesting party should also show that the responding party's production "has been inadequate and that a search of the opponent's [electronic storage device] could recover deleted relevant materials." Courts have been reluctant to rely on mere skepticism or bare allegations that the responding party has failed to comply with its discovery duties. Even if the requesting party makes this threshold showing, courts should not permit the requesting party itself to access the opponent's storage device; rather, only a qualified expert should be afforded such access, and only when there is some indication that retrieval of the data sought is feasible. Due to the broad array of electronic information storage methodologies, the requesting party must become knowledgeable about the characteristics of the storage devices sought to be searched in order to demonstrate the feasibility of electronic retrieval in a particular case. And consistent with standard prohibitions against "fishing expeditions," a court may not give the expert carte blanche authorization to sort through the responding party's electronic storage device. Instead, courts are advised to impose reasonable limits on production. Courts must also address privilege, privacy, and confidentiality concerns. Finally, federal courts have been more likely to order direct access to a responding party's electronic storage devices when there is some direct relationship between the electronic storage device and the claim itself.

*Id.* at 317–18 (internal citations omitted). The court further held that even "[i]f the

responding party meets its burden by demonstrating that retrieval and production of the requested information would be overly burdensome, the trial court may nevertheless order targeted production upon a showing by the requesting party that the benefits of ordering production outweigh the costs." *Id.* at 315.

Here, as discussed above, Arthur contended at the December 2008 hearing on her motion to compel that Stern had defaulted in his obligation to produce responsive emails. However, while objecting to overbroad discovery, Stern's counsel stated on the record that he had agreed to produce nonprivileged emails between himself and his co-defendants concerning Arthur dating from October 12, 2006 through March 14, 2008 and that he would produce any additional nonprivileged emails going to the jurisdictional issue. No showing was made to the trial court that Stern's counsel's representations were false or made in bad faith. And, as stated above, despite Stern's objections to the scope of the discovery sought, no showing was made that the discovery sought was essential to justify her opposition to Stern's special appearance or was within the scope of discovery permitted by the Texas discovery rules.

Nor did Arthur move prior to the December hearing, or even at the hearing, to compel production of Stern's "electronic media." Rather, Arthur specifically requested production of Stern's electronic data and hard drive, as required by Texas Rule of Civil Procedure 196.4, only *after* the hearing on her motion to compel had been held. *See* TEX.R. CIV. P. 196.4. Stern's counsel, however, anticipating such a request at the hearing, stated on the record that Stern used a web-based internet service and that copies of his emails were not retained on his hard drive. He also indicated that the relevant emails could be subpoenaed from Yahoo! Business, where he stated that any that exist could be found. There is no indication in the record that Stern's counsel's representations were false or that Arthur accepted his offer. Nor did the trial court require Arthur to make any showing that Stern's emails were stored on the hard drive in his computer rather than on the internet, where Stern stated they were located through representations by his counsel at the December 11, 2008 hearing and personally averred by affidavit in response to Arthur's supplemental motion to compel production of his "electronic media."

There was thus no showing that a search of Stern's computer hard drive could recover deleted relevant materials that would have shown jurisdiction, i.e., there was no showing of a direct relationship between the ordered search of Stern's hard drive and the establishment of the trial court's jurisdiction over Stern. *Cf. In re Weekley Homes,* 295 S.W.3d at 317–18. Rather, the court relied on Arthur's counsel's "bare allegations that [Stern] ha[d] failed to comply with [his] discovery duties." *Id.* On this basis alone the court ordered Stern to turn his hard drive over to a special master, Craig Ball.

Moreover, the court appointed Ball as special master without following any of the procedures required by Texas Rule of Civil Procedure 171 before a special master may be appointed. *See* TEX.R. CIV. P. 171. We have previously held, in an opinion on another petition for mandamus arising out of the same underlying case, that the failure to follow the requirements of Rule 171 in appointing a special master is an abuse of discretion. *See In re Harris,* 315 S.W.3d 685, 703–06 (Tex.App.-Houston [1st Dist.] 2010, orig. proceeding). These requirements were not followed in this case, as they were not in *In re Harris. See id.*

■ The court also gave the special master and forensic examiner "carte blanche authorization to sort through

[Stern's] electronic storage device," directly contrary to the directive of *In re Weekley Homes*. *See* 295 S.W.3d at 318. Ball was instructed to image the hard drive for relevant documents, then to provide a list of these documents to Stern from which to construct a privilege log. This general procedure has been adopted by Texas courts. *See In re Honza*, 242 S.W.3d 578, 582 (Tex.App.-Waco 2008, orig. proceeding). However, Ball was given not only unrestricted access to all documents on Stern's hard drive but "discretion to employ or modify search terms." Because the order does not supply search terms, Ball was given virtually free reign to plumb Stern's hard drive. *Cf. In re Honza*, 242 S.W.3d at 583 (search explicitly limited to two documents). Granting a special master carte blanche authorization to sort through Stern's computer hard drive clearly violated the longstanding prohibition against impermissible "fishing expeditions." *See* Tex.R. Civ. P. 192.4; *In re Weekley Homes*, 295 S.W.3d at 317–18; *Sanderson*, 937 S.W.2d at 431.

■ Finally, a hard drive should not be produced unless the party seeking production shows that data retrieval from the hard drive is feasible. *See In re Weekley Homes*, 295 S.W.3d at 320 ("The missing step is a demonstration that the particularities of Weekley's electronic information storage methodology will allow retrieval of emails that have been deleted or overwritten, and what that retrieval will entail."). The trial court did not require of Arthur any showing that retrieval of the data sought was feasible, as required by *In re Weekley Homes* to justify appointment of a forensic examiner accessing an electronic storage device. *See In re Weekley Homes*, 295 S.W.3d at 317–18. Indeed, Stern offered an affidavit stating that retrieval of emails from his hard drive was not feasible because he uses Yahoo! Business for all email, which is a web-based interface that stores the emails of its users on Yahoo!'s servers rather than on the user's hard drive. *Id.* Arthur did not provide contrary evidence challenging Stern's assertion that web-mail based applications, such as Yahoo! Business, do not save emails to a user's personal hard drive. Accordingly, Arthur failed to show that retrieval of emails from Stern's hard drive was feasible and the trial court clearly erred in ordering production of the hard drive. *Id.*

We conclude that the trial court clearly abused its discretion in appointing Craig Ball as special master and forensic examiner with power to search Stern's computer hard drive for documents and in ordering Stern to turn his hard drive over to him.

We sustain Stern's third, fourth, and fifth issues.

### Conclusion

We conditionally grant the petition for writ of mandamus and direct the trial court to vacate its discovery order against Stern issued on May 11, 2009. All pending motions are denied as moot.